UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------X
ELIZABETH SIEGEL,

                    Plaintiff,                          **MEMORANDUM AND ORDER**
                                                            10-CV-4285 (DRH) (ETB)

            - against -

HARTFORD LIFE INSURANCE COMPANY,

                    Defendants.
---------------------------------------------------------X
**APPEARANCES:**

**YOELI GOTTLIEB & ETRA LLP**
Attorneys for Plaintiff
260 Madison Avenue
18th Floor
New York, New York 10016
By:    Michael Yoeli, Esq.

**SEDGWICK LLP**
Attorneys for Defendant
125 Broad Street
39th Floor
New York, New York 10004
By:    Michael H. Bernstein, Esq.
          John T. Seybert, Esq.

**HURLEY, Senior District Judge:**

      On September 21, 2010, plaintiff Elizabeth Siegel ("Siegel") commenced this action

seeking to recover long term disability benefits under an insurance policy issued by defendant

Hartford Life Insurance Company ("Hartford"), pursuant to the Employee Retirement Income

Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").  Presently pending

before the Court are Hartford's motion and Siegel's cross-motion seeking summary judgment

pursuant to Federal Rule of Civil Procedure 56.  Hartford has also filed a motion to strike certain

statements made in Siegel's motion papers.  For the reasons set forth below, Hartford's motion

for summary judgment is granted, Siegel's cross-motion for summary judgment is denied, and

Hartford's motion to strike is deemed moot.

### BACKGROUND

The following facts are drawn from the parties' Local Civil Rule 56.1 Statements, and are

undisputed unless otherwise noted.

### I.    Siegel's Employment and Medical History

On May 11, 1987, Siegel began working for United Business Media ("UBM") as an

Assistant Distribution Manager.  In June 2006, Siegel was diagnosed with spondylolysis and

degenerative disk disease.  Siegel underwent lumbar spine surgery on September 6, 2006.  After

the surgery, Siegel continued to complain of back, neck, and leg pain.  (Pl.'s 56.1 ¶¶ 3-17.)  On

November 6, 2007, Siegel underwent a revision surgery and lumbar fusion of the spine from L3

to S1.  (Def.'s 56.1 ¶ 4; Pl.'s 56.1 ¶ 18.)

On November 16, 2007, December 16, 2007, and January 21, 2008, Siegel saw Dr.

Sebastian Lattuga, her orthopedic surgeon, for follow-up appointments.  Dr. Lattuga noted that

Siegel was "doing well" postoperatively.  (Pl.'s 56.1 ¶¶ 19, 20.)  Dr. Lattuga prescribed

Skelaxine and Vicodin, and directed Siegel to continue with physical therapy.  (*Id.* ¶ 19.)  Siegel

returned to work on January 28, 2008.

### II.    Siegel's Medical Treatment Following her Return to Work

Between Siegel's return to work on January 28, 2008 and her last day of work at UBM

October 17, 2008, Siegel saw Dr. Lattuga on a number of occasions for postoperative follow-up

examinations.  On March 17, 2008, Dr. Lattuga noted that Siegel was "doing well

postoperatively" and that lumbar x-rays showed satisfactory placement of implants.  (Pl.'s 56.1 ¶

20.)   Dr. Lattuga stated that she should "continue physical therapy and refrain from any heavy[ ] lifting, carrying, or bending and take medications as needed."  (AR 333.)[1]

At a follow-up visit on May 5, 2008, Dr. Lattuga noted that Siegel was "doing well postoperatively, [and she] states [that] she is better, however [she] still needs medication."  (AR 295.)  On that day, Siegel's "pain severity score [was] 8/10."  (*Id.*)  For the first time, Dr. Lattuga noted: "Motor strength is abnormal, TA/EHL 4+/5."  (AR 296.)  Because Siegel was "continu[ing] to have pain," Dr. Lattuga ordered a "CT scan of the lumbar spine to examine the fusion."  (*Id.*)  "In the meantime," Dr. Lattuga directed Siegel to "continue physical therapy and refrain from any heavy[] lifting, carrying, or bending" and to take her medication "as needed." (*Id.*)

Two weeks later, at a May 19, 2008 follow-up appointment to review the CT scan, Dr. Lattuga noted that Siegel was "continuing to improve," and that Siegel's "pain severity score [was] 7/10."  (AR 293.)  Dr. Lattuga determined that Siegel's fusion was "progressing" and again instructed her to continue physical therapy, refrain from heavy lifting, bending, or carrying, and to take her medication as needed.  (AR 294.)  In addition, Dr. Lattuga instructed Siegel to "wear a bone stimulator" as needed.  (*Id.*)

On June 30, 2008, Dr. Lattuga again found that Siegel was "doing well postoperatively, [and] continuing to improve," with "progressing fusion."  (AR 291, 292.)  Dr. Lattuga further noted that Siegel "continues to complain of neck pain and upper extremity radiation," and had a

---

[1]     "AR" refers to Hartford's claim file, which constitutes the administrative record kept and maintained by Hartford in connection with Siegel's claim for long term disability benefits.  The AR is attached to the Declaration of Erik M. Solem, dated May 24, 2011 ("Solem Decl.") as Exhibit B.

"pain severity score [of] 7/10." (AR 291.) Siegel's treatment plan remained the same: "Continue physical therapy and refrain from any heavy[] lifting, carrying, or bending, wear [a] bone stimulator and take medication as needed." (AR 292.) Dr. Lattuga prescribed Vicodin for Siegel. (*Id.*)

At a September 5, 2008 follow-up examination, Dr. Lattuga reported that Siegel was "doing well postoperatively, better than her condition was before her second surgery." (AR 289.) Dr. Lattuga noted Siegel's complaints of "occasional leg cramping," as well as "neck pain and upper extremity radiation." (*Id.*) Siegel's pain severity score was 7/10. Dr. Lattuga directed Siegel to "obtain a lumbar CT scan to assess the fusion" and, in the meantime, recommended that she continue the same course of treatment: continue physical therapy, refrain from heavy lifting, carrying or bending, and wear a bone stimulator. (AR 290.) Dr. Lattuga prescribed Vicodin and Skelaxine that Siegel could take "as needed." (*Id.*)

On October 6, 2008, Siegel presented to Dr. Lattuga with "continued improvement of low back pain," although she "complain[ed] of neck pain and upper extremity radiation." (AR 287.) Siegel's pain severity score was 7/10. Dr. Lattuga reviewed the Lumber CT scan, taken on September 19, 2008, and noted that "[p]suedoarthrosis cannot be excluded," but that there were "no significant changes." (AR 288.) Dr. Lattuga recommended "[c]ontinued observation and restriction of activities." (*Id.*) Dr. Lattuga concluded: "In the meantime, [Siegel] is to continue physical therapy and refrain from any heavy[] lifting, carrying, or bending and take medication as needed. [Siegel] is to follow up in several weeks for a repeat evaluation." (*Id.*)

### III.    *Siegel's Employment is Terminated*

After Siegel's return to work on January 28, 2008, she worked for nine months through

October 17, 2008, which was a Friday.  Siegel took personal/sick time on October 20, 21, and 22,

2008 (i.e., Monday through Wednesday).  On October 23, 2008, Siegel was informed by

telephone that she was being laid off by UBM as part of a reduction in workforce.

That same day, on October 23, 2008, Siegel saw Dr. Lattuga for a follow-up examination.

(AR 285-86.)  Hartford asserts that Siegel saw Dr. Lattuga after she learned that she was to be

laid off, but plaintiff denies that allegation.  (*See* Pl.'s Response to Def.'s 56.1 ¶ 8.)[2]  In his notes

from the October 23, 2008 visit, Dr. Lattuga observed that Siegel "has continued improvement of

low back pain" but also "complains of neck pain and upper extremity radiation."  (AR 285.)

Siegel's pain severity score was 7/10.  (*Id.*)  In the "Impression/Plan" section of Dr. Lattuga's

notes from the October 23, 2008 visit, he wrote:

> Patient has severe frequent exacerbations.  Continued observation and
> restriction of activities.  In the meantime, patient is to refrain from
> any heavy[ ] lifting, carrying, or bending and [should] take
> medication as needed.  Patient is to follow up in several weeks for a
> repeat evaluation.  ***This patient is totally disabled.***

(AR 286 (emphasis in the original).)

## IV.    *Siegel's Claim for Short-Term Disability Benefits*

Siegel applied for New York State Short-Term Disability ("STD") benefits through

UBM's STD Plan, which was administered by Hartford.  In connection with this claim, UBM

provided Hartford with a Physical Demands Analysis ("PDA") that outlined the physical

requirements for Siegel's position as an Assistant Business Manager.  (AR 431-35.)

---

[2]      It is unclear from the administrative record whether Siegel's October 23, 2008
appointment was previously scheduled.

### A.      The PDA Form

The PDA was completed by Joanne Como, a UBM "HR Generalist," on December 22,

2008.  The PDA has a section entitled "Sitting/Standing/Walking Requirements" that sets forth

two charts.  One chart indicated the number of "[t]otal hours during a typical workday" that

Siegel was required to sit, stand, or walk, respectively.  The chart had three rows (one row each

for sitting, standing, and walking).  Each row had a list of numbers from 0 through 8+, and Como

circled the appropriate number to indicate the number of hours Siegel was required to spend

doing each of these three activities.  This section of the PDA indicated that Siegel was required

to sit for seven hours total during the workday, stand for ½ hour total during the workday, and

walk for ½ hour total during the workday.  (AR 432.)

The second chart in this section of the PDA had a format that was identical to the first,

but indicated the number of "[t]otal hours at one time" that Siegel was required to sit, stand, and

walk.  In the "Sitting" row, the number "2" was circled.   In both the "Standing" and "Walking"

rows the number ".5" was circled, with the phrase "less than" handwritten above the circled ".5".

(*Id.*)  To the left of the "Total hours at one time" chart, was the handwritten phrase "determined

by employee," with lines connecting that phrase to the sitting, standing, and walking rows in the

chart.  (*Id.*)

Under the two charts was the question "Alternate sitting and standing as needed?" with

"Yes" or "No" checkbox.  Como checked the "No" checkbox in response to this question.  (*Id.*)

### B.      Siegel is Approved for STD Benefits

On January 27, 2009, Siegel was approved for STD benefits through March 18, 2009,

with the possibility of an extension through April 24, 2009.  (AR 113-14.)

## V.     *Relevant Provisions of the LTD Plan*

Siegel was enrolled in the Group Long Term Disability Plan for Employees of UBM (the

"LTD Plan"), which was issued and administered by Hartford.  The LTD Plan defines

"disability" as follows:

> **Disability or Disabled** means You are prevented from performing
> one or more of the Essential Duties of:
>
> 1) Your Occupation during the Elimination Period;
>
> 2) Your Occupation, for the 24 month(s) following the Elimination
> Period, and as a result Your Current Monthly Earnings are less than
> 80% of Your Indexed Pre-Disability Earnings; and
>
> 3) after that, Any Occupation.

(Solem Decl., Ex. A at 028.)  The LTD Plan defines "Your Occupation" as follows: "**Your**

**Occupation** means Your Occupation as it is recognized in the general workplace.  Your

Occupation does not mean the specific job You are performing for a specific employer or at a

specific location."  (*Id.* at 031.)

The LTD Plan grants full discretionary authority to Hartford, stating:

> **Policy Interpretation:** *Who interprets the terms and conditions of*
> *The Policy?*
>
> We[3] have full discretion and authority to determine eligibility for
> benefits and to construe and interpret all terms and provisions of The
> Policy.  This provision applies where the interpretation of The Policy
> is governed by the Employee Retirement Income Security Act of
> 1974, as amended (ERISA).

(*Id.* at 027 (footnote added).)  The LTD Plan also provides that: "The Plan has granted the

---

[3]      The LTD Plan defines the term "We" to mean "the insurance company named on the face page of The Policy," which, in this case, is Hartford.  (Solem Ex. A at 031; *see also id.* at 001.)

Insurance Company full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." (*Id.* at 036.)

## VI.    *Siegel's Claim for LTD Benefits*

On January 27, 2009, Hartford received Siegel's claim for LTD benefits. Joshua P. Suby, a Hartford Ability Analyst, was assigned to review the claim. Suby reviewed the information in Siegel's STD file, but noted that because Siegel's file did not contain any medical records, he would need additional documentation before he could undertake "any LTD consideration." (AR 114.) By letter dated January 27, 2009, Suby provided Siegel with an Attending Physician Statement ("APS") form and Physical Capabilities Evaluation ("PCE") form to complete and return. (AR 429.)

### A.    *Siegel's Telephone Interview*

On January 28, 2009, Suby conducted a telephone interview with Siegel. During the interview, Siegel reported that her last day of work at UBM was October 17, 2008 and that she "began having spasm for about 3 weeks prior to [her last day of work], [and] finally couldn't take the pain any longer so [she] had to go [out of work]." (AR 111-12.) Siegel described her "functionality" as being unable to bend or twist at all, or to lift anything weighing more than one or two pounds. (AR 112.) She stated that she could not "turn [her] neck much, [and could not] sit/stand for very long at all without changing positions," but could "[d]rive short distances." (*Id.*)

### B.    *The APS and PCE Forms Completed by Dr. Lattuga*

On March 2, 2009, Dr. Lattuga completed the APS form and indicated therein that Siegel had been diagnosed with lumbar radiculopathy and had undergone post surgical lumbar fusion.

(AR 405-06.)  Dr. Lattuga, however, did not complete the section of the APS labeled "Functional Capabilities," but simply wrote "Totally Disabled" across that section of the form.

On the PCE form, which Dr. Lattuga also completed on March 2, 2009, he set forth his "clinical assessment from [Siegel's] most recent examination," and stated that in "a general workplace environment" Siegel could sit for 40 minutes at a time, stand for 30 minutes at a time, and walk for 20 to 30 minutes at a time.  (AR 407-08.)  Dr. Lattuga did not indicate the total number of hours that Siegel could sit, stand, or walk per day.  (AR 407.)

Hartford received both the completed APS and PCE forms on March 17, 2009.  On March 20, 2009, Kathryn N. Anderson, a new Hartford Ability Analyst assigned to Siegel's claim, reviewed these forms.  Anderson concluded that she had insufficient information to decide whether Siegel's STD benefits (which were set to expire on April 24, 2009) should be extended or whether LTD benefits could begin on April 25, 2009.  (AR 109-10.)  On March 20, 2009, Anderson requested further medical records from Dr. Lattuga (AR 109) and, by letter of the same date, sent Siegel another PCE form with instructions that Dr. Lattuga was to complete the form by providing more specific information about her restrictions and limitations.  (AR 379-80.)

### C.    Records Provided by Dr. Lattuga

On March 23, 2009, Hartford received the requested medical records from Dr. Lattuga's office, which included Dr. Lattuga's notes from Siegel's office visits on October 6 and October 23, 2008, as described above.  The records also included Dr. Lattuga's notes from office visits Siegel made on January 19, 2009 and March 16, 2009.   Anderson reviewed all these medical records on March 24, 2009 and noted that Dr. Lattuga had only restricted Siegel from heavy lifting, carrying, and bending.  Anderson decided to wait for the updated completed PCE before

9

making a determination on Siegel's LTD claim.

### D.     Amended PCE Form Completed by Dr. Lattuga

On April 17, 2009, Siegel faxed Hartford another PCE form, which was completed by Dr. Lattuga on March 27, 2009.  (AR 373-75.)  This PCE form indicated that Siegel could sit for 40 to 60 minutes at a time, and for a total of two hours per day.  It further indicated that Siegel could stand for 20 to 30 minutes at a time, for a total of two hours per day, and could walk for 30 to 40 minutes at a time, for a total of two hours per day.  (AR 374.)

### E.     Additional Materials Siegel Submitted to Hartford on April 17, 2009

On April 17, 2009, Siegel sent Hartford a copy of a Medical Source Statement ("MSS"), which she intended to submit to the Social Security Administration in support of her application for social security disability benefits.  The MSS, completed by Dr. Lattuga on April 17, 2009, indicated that the maximum amount of time that Siegel could sit continuously was thirty minutes. (AR 376.)  After that, she would have to walk around for fifteen minutes before she could return to a seated position for another thirty minute interval.  (*Id.*)  The MSS indicated that the total amount of time that Siegel could sit during an eight hour workday was two hours.  (*Id.*)

The MSS also indicated that during an eight hour work day, Siegel needed a resting period of one hour, and that this resting period should be in addition to morning, lunch, and afternoon breaks each scheduled at approximately two hour intervals.  (AR 377.)  Dr. Lattuga concluded the MSS by stating that Siegel's restrictions had existed, as defined in the MSS, since October 17, 2008.  (AR 378.)

### VII.   Anderson's Decision on Siegel's LTD Benefits Claim

On April 22, 2009, Anderson reviewed all of the information received from Siegel, as

10

outlined above.  In her "Assessment," Anderson noted that:

> The restrictions provided by Dr. Lattuga would prevent [Siegel] from performing her own sedentary occ[upation]. [Siegel's] occupation requires sitting 2 hrs at a time, 7 hrs per day, and AP notes she can only sit 40-60 minutes at a time, 2 hrs total per day.  It is reasonable that [Siegel] would be unable to sit for more than an hour at a time because of her back pain and spasms.  As the [restrictions/limitations] would prevent [Siegel] from performing her own occ[upation], will approve LTD benefits.

(AR 104.)  Thus, Anderson extended Siegel's STD benefits through April 24, 2009 (the maximum expiration date).  (AR 105.)  She also "[a]pprove[d] LTD," but put payments on hold because she needed a team leader to "sign off."  (*Id.*)  Anderson referred the file to Hartford's Special Investigation Unit.  (*Id.*)

## VIII.   *Hartford's LTD Team Leader's Review of Siegel's LTD Benefits Claim*

On April 23, 2009, Noelle Anderson ("Noelle"), Hartford's LTD Team Leader, reviewed Siegel's records and discussed the file with Anderson.  (*Id.*)  Noelle made the following notes:

> It is not clear what changed in EE's condition as of 10/18/08 to render her disabled from her sedentary occ[upation].  EE had fusion surgery 11/6/07, and she RTW FT 1/28/08.  She has been able to work from Jan. '08 until Oct. '08 with no obvious change in her condition.  The OV notes from 10/6/08 and 10/23/08 are identical with regard to complaints and exam findings.  However, while the 10/6 OV noted that EE was doing well, the 10/23/08 OV indicated severe frequent exacerbations.  Unclear why the assessment on 10/23 is different when the exam findings were the same on 10/6 when EE was doing well.  Also, we do not have support of disability beginning 10/18/08 from a physician.  EE was not treated until 10/23/08, which is also the same date she was laid off.

(AR 105.)  Noelle recommended that Siegel's file be referred to a Medical Case Manager ("MCM") to assess whether the restrictions and limitations set forth in Dr. Lattuga's March 27, 2009 PCE were "supported by the medical findings, and if they are supported back to 10/18/08."

(*Id.*)

On April 23, 2009, at Noelle's request, Anderson contacted Dr. Lattuga's office to request his office notes dating back to January 2008.  (AR 102.)

## IX.   Hartford's Medical Management Review of Siegel's File

On April 27, 2009, Siegel's file was referred to Mindy Madsen, a Hartford Nurse, for a medical management review.  Madsen reviewed Siegel's medical records and made the following observation:

> Based on the medical records, MCM supports that the 3/27/09 PCE restrictions are overly limiting, however based on the exam findings, EE may not tolerate prolonged sitting up to 7 hours in the work day. EE is in PT, however those notes are not available [f]or review. Information contained in the AP notes is a bit sparse.  In the records submitted for review and review of Comments, MCM did not see AP support of restrictions prior to 10/23/08.  It appears per Comments that additional records were received, thus MCM would like to review those prior to further assessment and claim management plan.

(AR 102.)  On April 27, 2009, Hartford received the additional medical records that had been requested from Dr. Lattuga.  (AR 308.)  These records included operative reports for Siegel's September 6, 2006 and November 6, 2007 surgeries (AR 309-11), as well as office visit notes from her first office visit on June 26, 2006 through her March 16, 2009 visit.  (AR 312-64.)

Madsen reviewed these records on April 28, 2009.  (AR 100.)  In her notes, Madsen observed:

> Records reveal EE has the same ROM for instance on 5/19/08 as she does on 3/16/09.  EE also has the same complaints of pain (rates 7/10) in the records prior to [the Date of Disability ("DOD")] as she does following her DOD.  MCM is unclear what changed in EE's condition that would support why she was no longer able to function at her sedentary occupation.  In an attempt to clarify what changed in EE's condition, MCM will contact Dr. Lattuga.

12

(AR 101.)  That same day, Madsen contacted Dr. Lattuga's office (AR 100) and then faxed him

six questions, including:

> 1)   Do you agree Ms. Siegel can sit up to 2 hours at a time up to
>       7 hours per day?  YES or NO.
>
> 2)   If you do not agree, please provide a detailed rationale to
>       include objective findings and recent diagnostic testing that
>       supports why Ms. Siegel can not sit up to 7 hours and what
>       changed in her condition in October 2008 to warrant the
>       restrictions you provided.

(AR 306.)  On April 28, 2009, Madsen spoke to Siegel regarding her condition.  Siegel stated

that she began having "severe muscle spasms" in September 2008, and that she could not sit,

stand, or walk for prolonged periods without suffering increased pain and muscle spasms. (AR

100.)  According to Siegel, her "current treatment" consisted of "home PT every day, walking

when she can and wearing her bone growth stimulator up to 4 hours per day, along with [muscle]

relaxers (potentones) and [V]icodin." (*Id.*)  Siegel also stated that her doctor advised her that

"her fusion still has not [completely] grafted so he continues to watch this." (*Id.*)

As of May 12, 2009, Madsen had not received a response to the questions she sent to Dr.

Lattuga.  She discussed the claim with Anderson and Noelle and noted that it "remains unclear as

to what changed in EE's condition around 10/08 to substantiate the 3/27/09 PCE restrictions."

(AR 99.)  Madsen requested "vendor management." (*Id.*)

**X.     *Dr. Levy's Independent Medical Record Peer Review***

On May 14, 2009, Madsen submitted a referral to Reliable Review Services ("RRS") for

an independent medical record peer review.  Meanwhile, on May 20, 2009, Dr. Lattuga finally

responded to the questions posed in Madsen's April 28, 2009 letter.  (AR 281-83.)  In response to

the first question (i.e., whether he agreed that Siegel could sit up to two hours at a time for a total of seven hours per day), Dr. Lattuga circled "No." (AR 282.)  In response to the second question, which asked for "a detailed rationale to include objective findings and recent diagnostic testing," Dr. Lattuga wrote:  "Increased pain and [lower extremity] numbness."  (*Id.*)  In response to a separate question, Dr. Lattuga added: "Decreased range of motion – Status post lumbar fusion 11/6/07.  No bending, lifting or carrying.  No sitting [or] standing [for a] long period (20 mins)." (AR 283.)  Madsen reviewed Dr. Lattuga's letter and forwarded it to RRS.

RRS referred the medical record review to Michael Levy, M.D., a board certified neurosurgeon.  Dr. Levy reviewed the following documentation: (1) Hartford's summary detail reports,[4] (2) an LTD Income Benefits Questionnaire completed by Siegel (AR 415), (3) Madsen's April 23, 2009 letter to Dr. Lattuga and his May 14, 2009 responses to her questions, (4) Siegel's Authorization Release form, (5) the MSS completed by Dr. Lattuga on April 17, 2009, (6) the PCE forms completed by Dr. Lattuga, (7) Dr. Lattuga's office visit notes from June 26, 2006 through March 16, 2009, (8) the APS completed by Dr. Lattuga on March 2, 2009, and (9) Dr. Lattuga's Operation Summary dated November 6, 2007.  (AR 272-73.)  Dr. Levy attempted to contact Dr. Lattuga by telephone on three occasions (May 21, 22, and 28, 2009), but was not able to speak to Dr. Lattuga.  (AR 273.)

In a report dated June 1, 2009, Dr. Levy "agree[d] with the functional abilities and restrictions provided by Dr. Lattuga via the 03/27/2009 Physical Capabilities Evaluation form." (AR 273.)  In his "Assessment/Rationale" section, Dr. Levy wrote:

---

[4]        Hartford asserts that its summary detail reports included the details of the PDA completed by UBM.  (AR 114, 263.)

14

> As of 04/28/2009 the patient's surgeon documents that she should not sit for periods greater than two hours in a seven hour period, occasionally reach at waist level, cannot reach below waist level, and not stand stationary for periods greater than 20 minutes. Based on the above, the patient is impaired but could continue to work at the sedentary level per DOT Guidelines.

(AR 275.)

Madsen received Dr. Levy's report on June 3, 2009. Madsen noted that she needed to contact RRS to obtain "clarification of [Dr. Levy's] statement 'Based on the above, the patient is impaired but could continue to work at the sedentary level per DOT Guidelines.'" (AR 96.) Madsen further noted:

> It would appear Dr. Levy is supporting that EE is capable of sitting 2 hours in a workplace. This would NOT support that she could "continue working at the sedentary level per DOT Guidelines." MCM is confused as to [whether] Dr. Levy is supporting [that] EE has full time seated function or 2 hours of seated function.

(*Id.*) Accordingly, Madsen sent two follow up questions to Dr. Levy. (Pl.'s 56.1 ¶ 106.) Those questions and Dr. Levy's responses were set forth in an addendum to his report, dated June 5, 2009 (AR 261-29), as follows:

> **1.    Does Dr. Levy believe the claimant should be able to perform . . . full-time seated duties (sedentary)? Or does he agree with the total two hours of sitting, 2 hours standing, and 2 hours walking per the 03/27/2009 Physical Capacity Evaluation (PCE) form?**
>
> I believe the claimant should be able to perform full-time seated duties (sedentary).
>
> **2.    Is it Dr. Levy's opinion that the change was, per his response, "On 10/23/2008 the patient has severe frequent exacerbations, and required continued observation and restrictions of activities"?**

15

> Yes, the change was that on 10/23/2008 she had severe frequent
> exacerbations.

(AR 267.)  Dr. Levy's report was sent to Dr. Lattuga on June 8, 2009 for comment, but Dr.

Lattuga did not respond.

### XI.    *Hartford Denies Siegel's LTD Benefits Claim*

On June 30, 2009, Siegel's file was returned to Anderson for review.  After reviewing the

relevant documentation, Anderson stated:

> The medical information does not support EE's inability to perform
> the Essential Duties of a Distribution Manager.  From the medical
> records, there is no evidence of a change on 10/18/08 that would
> suddenly prevent EE from performing sedentary job duties.  The
> medical information does not support the ability to sit, stand, and
> walk only 2 hrs each total, representing 6 hrs of functionality per day.
> The other restrictions provided by AP (can only lift up to 10
> [pounds], [cannot] carry, or bend) are not part of EE's job duties.  Dr.
> Lattuga has not responded to requests for claim discussions w/either
> [MCM] or RRS.

(AR 94.)  Accordingly, Anderson recommended denying Siegel's claim for LTD benefits.  (*Id.*)

On July 1, 2009, Susan Peterson, a Hartford LTD Claim Specialist, agreed with Anderson's

recommendation.  (*Id.*)

By letter dated July 1, 2009, Anderson notified Siegel of Hartford's decision to deny her

claim for LTD benefits.  (AR 461-64.)  With respect to Siegel's job description, Anderson wrote

that based on the employer's job description and the PDA, "this position requires sitting less than

two hours at a time, seven hours per day . . . This occupation is considered Sedentary in the

national economy."  (AR 462.)  With respect to Dr. Levy's report, Anderson reiterated that: "Dr.

Levy agreed with the functional abilities and restrictions as outlined [in Dr. Lattuga's] Physical

Capabilities Evaluation form dated March 27, 2009, however [he] noted that you should be

capable of performing full time sedentary work."  (AR 463.)

Anderson relayed that multiple requests to Dr. Lattuga for his comment regarding "whether [Siegel is] capable of performing full time seated work" had gone unanswered.  (*Id.*) Anderson concluded the letter by stating: "The restrictions from Dr. Lattuga that indicate you can only sit, stand, and walk for two hours total per day are not supported by the medical information on file, and attempts to obtain additional comments from your physician were unsuccessful." (*Id.*)  Anderson advised that because Siegel's other restrictions did not prevent her "from performing the Essential Duties of [the] Assistant Distribution Manger" position, Siegel did "not meet the policy definition of Disabled" and that her claim for LTD benefits was denied.  (*Id.*) Anderson advised Siegel of her right to pursue an administrative appeal.

## XII.   *Siegel's Administrative Appeal*

On December 21, 2009, Siegel, through her counsel, submitted an administrative appeal request.  Siegel's appeal was assigned to Erik Solem, a Hartford Appeal Specialist.  At Solem's request, Dr. Lattuga provided Hartford with Siegel's updated medical records on January 14, 2010.  These records included office visit notes dated April 27, 2009, July 27, 2009 and November 9, 2009, as well as a statement from Dr. Lattuga, dated December 5, 2009, in which he wrote, in relevant part:

> Although the Patient is better . . . she continues to be severely disabled due to the fact that she has continued pain in the neck and back with radiation to both Upper and Lower Extremities.
>
> At this point in time Patient is totally disabled and should refrain from any activities that exacerbate her symptoms such as sitting, standing, lifting, carrying[, or] bending.  Sitting and standing should be limited to twenty to thirty minutes and then must change position. Lifting, carrying and bending should be avoided beyond ten pound

maximum.

(AR 244.)

On January 20, 2010, Solem made a note that Siegel's attorney had requested that Hartford send Siegel for an independent medical examination ("IME").  Solem denied this request, stating that a current IME would not assist him with his decision regarding whether Siegel was disabled between October 18, 2008 and April 24, 2009.

### XIII.   *Dr. Connolly's Independent Medical Record Peer Review*

On January 20, 2010, Solem referred Siegel's file to Managing Claims Managing Care ("MCMC") for an independent medical record peer review.  MCMC assigned the referral to Patrick Connolly, M.D., a board certified orthopedic surgeon.  Dr. Connolly attempted to speak with Dr. Lattuga by telephone on several occasions, but was unsuccessful.  He also faxed a set of questions to Dr. Lattuga on February 22, 2010, but Dr. Lattuga did not respond.

After reviewing Siegel's records, Dr. Connolly issued a written report.  (AR 137-40.)  He concluded that Siegel "was impaired in back function, but [was] able [to] perform at a sedentary work level for the period of October 2008 through the present" with certain restrictions, i.e., "[l]imits of sitting, standing[,] walking for eight hours are up to 80% sitting, 20% standing or walking."  (AR 138.)  Dr. Connolly further concluded that "there [was] no evidence of any significant change or worsening of symptoms from both an objective and subjective standpoint from October 2008 through present."  (*Id.*)  His report concluded, in relevant part:

> The claimant is capable of sedentary work and has been capable of sedentary work since 10/01/2008.  Specifically, eight hours per day five days per week . . . up to 80% of workday can be sitting with 20% of workday standing or walking . . . Sedentary work will not further injur[e] this claimant.  The limitations of a sedentary job will

18

> minimize exacerbations of back pain.  Discomfort with sitting is not
> an acceptable justification for inability to work.

(AR 139.)

### XIV.   *Hartford Denies Siegel's Appeal*

After receiving Dr. Connolly's report, Solem requested and received an Occupational

Analysis for Siegel's position as an Assistant Distribution Manager.  The Occupational Analysis

stated that the "essential duties and corresponding demands" for the position of Assistant

Distribution Manager "are equal for the [employer] and in the national economy, as defined in

the DOT, Manager Distribution Warehouse, 185.167-018, and [the position] is considered a

sedentary occupation."  (AR 246.)

In a letter from Solem to Siegel's counsel dated April 12, 2010, Hartford informed Siegel

that it would uphold the initial denial of Siegel's claim for LTD benefits.  (AR 125-32.)  After

reviewing the history of Siegel's claim, Solem wrote:

> While Dr. Lattuga appears to maintain your client is unable to work,
> based on a review of the medical records, his opinion of Ms. Siegel's
> functional ability appears mostly, if not entirely, based on Ms.
> Siegel's self-report which does not appear entirely accurate given the
> lack of a documented event or injury to account for a sudden
> worsening of her symptoms in the office visit as well as the fact she
> was capable of working in her condition following back surgery for
> nine months prior to being notified her employment was being
> terminated.

(AR 131.)  Solem's letter advised Siegel of her right to commence a civil action pursuant to

ERISA, and this action followed.

## *DISCUSSION*

### I.    *Summary Judgment Standard*

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other

documentation demonstrates both the absence of a genuine issue of material fact and one party's

entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d

712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are

material; "only disputes over facts that might affect the outcome of the suit under the governing

law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party

demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all

inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could

find in the non-movant's favor.  *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d

Cir. 1996).

When determining whether a genuinely disputed factual issue exists, "a trial judge must

bear in mind the actual quantum and quality of proof necessary to support liability," or "the

substantive evidentiary standards that apply to the case."  *Anderson*, 477 U.S. at 254-55.    The

court must resolve all factual ambiguities and draw all reasonable inferences in favor of the

non-moving party.  *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d

Cir. 1987).   A district court considering a summary judgment motion must also be "mindful of

the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928

(5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the

respective parties will bear at trial guide the district court in its determination of a summary judgment motion.  *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988).  Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim.  *See id.* at 210-11.  Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'"  *Brady*, 863 F.2d at 211 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## II.     Standard of Review

As a threshold matter, the Court must determine the appropriate standard of review to apply to Hartford's denial of Siegel's claim for LTD benefits.  The Supreme Court has made clear that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 249 (2d Cir. 1999).  If such discretion is given, a district court must review the administrator's denial of benefits deferentially, and may reverse only if the administrator's decision was arbitrary and capricious.  *See Kinstler*, 181 F.3d at 249.

The parties agree that the LTD Plan vested Hartford, as the administrator, with sufficient discretionary authority such that an arbitrary and capricious standard of review is appropriate.

21

(*See* Def.'s Mem. at 12; Pl.'s Mem. at 5-6, 14.)  Under the arbitrary and capricious standard of review, the Court may overturn a decision to deny benefits only if it is "'without reason, unsupported by substantial evidence or erroneous as a matter of law.'"  *Kinstler*, 181 F.3d at 249 (quoting *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995)).  "Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] . . . requires more than a scintilla but less than a preponderance."  *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 145 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)).   This scope of review is narrow, and the Court may not substitute its own judgment for that of the decision maker.  *Pagan*, 52 F.3d at 442; *see also Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995) ("The court may not upset a reasonable interpretation by the administrator.").  Thus, "[t]he question before a reviewing court under this standard is 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'"  *Jordan*, 46 F.3d at 1271 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)) (internal citation and quotation marks omitted).  Moreover, in its narrow review, the Court may not consider evidence beyond the administrative record, but should consider only the information presented prior to the administrator's final determination.  *Miller*, 72 F.3d at 1071; *Klecher v. Metro. Life Ins. Co.*, 2005 WL 1337509, at *8 (S.D.N.Y. June 6, 2005), *aff'd*, 167 Fed. Appx. 287 (2d Cir. Feb. 16, 2006).

**III.   *Hartford's Decision was not Arbitrary or Capricious***

Siegel raises a number of arguments in support of her assertion that Hartford acted

arbitrarily and capriciously by denying her claim for LTD benefits.  The Court addresses each of these arguments in turn.

### A.    *Hartford's Consideration of Siegel's Subjective Complaints of Pain*

Siegel claims that Hartford failed to give reasonable consideration to her subjective complaints of lower back pain.  Specifically, Siegel argues that Dr. Connolly "refused to credit" her complaints of pain "because in his view 'tolerance . . . is claimant driven," and pain was not an acceptable basis for the inability to work."  (Pl.'s Mem. at 16 (citing AR 139).)  Siegel asserts that Dr. Connolly's position runs contrary to Second Circuit law, and by relying on Dr. Connolly's findings in this regard, Hartford acted arbitrarily and capriciously.

A review of Dr. Connolly's report, however, shows that he did consider Siegel's subjective complaints of pain but found, ultimately, that they were not supported by an "exam or diagnostic evidence of pathology."  (AR 139.)  Moreover, there is ample record evidence beyond Dr. Connolly's report that demonstrates that Hartford did, in fact, consider Siegel's complaints of pain – both at the initial benefits determination level and as part of the administrative appeal.  (AR 112-14 (Anderson's notes); 101 (Madsen's notes); 274-75 (Dr. Levy's report); 94 (Anderson's denial recommendation); 463 (initial denial letter); 126-30 (appeal denial letter).)

After considering Siegel's subjective complaints of pain, Hartford concluded that those complaints were not supported by objective medical evidence.  (*See* AR 131 (appeal denial letter) (noting that Dr. Lattuga's opinion regarding Siegel's functional ability "appears mostly, if not entirely, based on Ms. Siegel's self report[,] which does not appear entirely accurate given the lack of a documented event or injury to account for a sudden worsening of her symptoms").)  For example, in his May 20, 2009 correspondence with Madsen, Dr. Lattuga indicated that the sitting

restrictions he recommended in the March 27, 2009 PCE were based solely upon Siegel's complaints of "[i]ncreased pain and [lower extremity] numbness," but he did not cite to any objective findings or diagnostic test results that would support that restriction.  (*See* AR 282.)  "It is not arbitrary and capricious for an administrator to require that a claimant present something more than her own unverified subjective complaints in order to qualify for disability benefits." *Lee v. Aetna Life & Cas. Ins. Co.*, 2007 WL 1541009, at *5 (S.D.N.Y. May 24, 2007) (finding that where a claimant did not receive a "firm diagnosis," "her doctors' statements of her disability were necessarily based only on [her] self-reported symptoms, and amount to no more than their assessment of her credibility," which "carries little weight in supporting a disability claim").

   As Siegel points out, a court reviewing "an administrator's decision *de novo* is not required to accept [a claimant's] complaints [of pain] as credible [but] it cannot dismiss complaints of pain as legally insufficient evidence of disability."  *Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 136 (2d Cir. 2001) (internal quotation marks omitted).  As several courts within the Circuit have noted, however, *Connors* dealt with a *de novo* standard of review – not an arbitrary and capricious standard.  *See Parisi v. Unumprovident Corp.*, 2007 WL 4554198, at *13 (D.Conn. Dec. 21, 2007) (citing *Lee*, 2007 WL 1541009 at *5 ("On arbitrary and capricious review, the consideration of such complaints, including credibility determinations, is within the discretion of the administrator.")).  When a plan administrator considers a claimant's subjective complaints of pain, but ultimately chooses not to credit them "in light of the absence of any medical diagnosis or corroborating evidence," such a determination is not arbitrary or capricious. *See Lee*, 2007 WL 1541009 at *5.

Siegel also takes issue with Hartford's decision not to credit her complaints of pain because "of the 'lack of a documented event or injury to account for a sudden worsening of her symptoms in the office visits as well as the fact that she was capable of working in her occupation following back surgery for nine months prior to being notified that her employment was being terminated.'" (Pl.'s Mem. at 17 (quoting AR 131).)  Siegel asserts that "this reasoning betrays a false premise based on a lack of understanding of the basic medicine involved in this kind of case." (*Id.* at 19.)  According to Siegel, "in a case involving a long history of degenerative spinal changes, . . . no such 'sudden' event is needed for a condition such as Ms. Siegel's to worsen." (*Id.* at 19-20.)  Unfortunately, Siegel has pointed to no medical evidence contained in the administrative record to show that this was true in her case.  Siegel notes that on October 6, 2008, after reviewing the results of a lumbar CT scan taken on September 19, 2008, Dr. Lattuga found that "fusion [was still] in evolution" and that "[p]suedoarthrosis cannot be excluded." (AR 288.)  Dr. Lattuga did not, however, diagnose Siegel with psuedoarthrosis, and any suspicion on his part that Siegel suffered from the condition was never confirmed with diagnostic testing.  Moreover, nothing in the administrative record supports Siegel's assertions, set forth in her legal memorandum, that "the revision surgery had failed to achieve its goal . . . [and] [t]here was, therefore, nothing surprising or unusual about the fact that she began having exacerbations in September 2008." (Pl.'s Mem. at 20.)[5]

---

[5]      Hartford moves to strike this portion of plaintiff's legal memorandum, contending that it constitutes nothing more than Siegel's counsel's "own non-expert medical opinion" proffered "in an effort to supplement the administrative record and offer an entirely different explanation for why Siegel was disabled under the Plan." (Def.'s Mot. to Strike at 4.)  Because the Court has determined that the administrative record does not support these assertions, and because the Court is ultimately unpersuaded by these arguments, Hartford's motion to strike is deemed moot.

**B.**     ***Evidence Regarding Siegel's Ability to Sit for the Required Number of Hours***

Siegel contends that the record lacks any "credible evidence" that she "could sit for the number of hours required to do her job." (Pl.'s Mem. at 21.)  As an initial matter, Siegel asserts that the PDA, which sets forth the sitting requirement for Siegel's position, was confusing because it simultaneously indicated that (1) the amount of time Siegel spent sitting or standing was "determined by the employee," but that (2) she could not "alternate sitting and standing as needed." (AR 155.)  Even if the Court were to assume *arguendo* that the PDA was confusing in this regard, it clearly indicated that Siegel's position required her to sit for no more than two hours at one time.  (*Id.*)

Hartford's task was to determine whether Siegel was disabled, i.e., unable to perform the essential duties of "Your Occupation."  (Solem Decl., Ex. A at 028.)  The LTD Plan defines "Your Occupation" as "it is recognized in the general workplace," and makes clear that "Your Occupation does not mean the specific job You are performing for a specific employer or at a specific location." (*Id.* at 031.)  The Occupational Analysis, performed at the request of Hartford, stated that the "essential duties and corresponding demands" for the position of Assistant Distribution Manager "are equal for the [employer] and in the national economy, as defined in the [Dictionary of Occupational Titles ("DOT")], Manager Distribution Warehouse, 185.167-018, and is considered a sedentary occupation." (AR 246.)  The DOT defines a sedentary occupation as "one which involves sitting, [as well as] a certain amount of walking and standing."  20 C.F.R. § 404.1567(a).

Thus, Hartford's conclusion that Siegel was required to sit for continuous periods of not longer than two hours (*see* AR 128) is supported both by the PDA and a reasonable interpretation

of sedentary job duties as defined by the DOT.  Both Dr. Levy[6] and Dr. Connolly concluded in

their reports that Siegel was able to perform full-time sedentary work and, accordingly, was able

to perform the essential duties of "Your Occupation," as that term was defined by the LTD Plan.

(*See* AR 267 (Dr. Levy), 139 (Dr. Connolly).)  Although Dr. Lattuga disagreed, Hartford was not

required to accord his opinion "special weight" simply because he was the treating physician.

*See Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) ("[C]ourts have no

warrant to require administrators automatically to accord special weight to the opinions of a

claimant's physician; nor may courts impose on plan administrators a discrete burden of

explanation when they credit reliable evidence that conflicts with a treating physician's

evaluation."); *Hobson v. Metro. Life Ins. Co.*, 574 F.3d 75, 85 (2d Cir. 2009).  This is particularly

true because, as noted above, the limitations Dr. Lattuga articulated in, for example, the March

27, 2009 PCE appear to be based entirely on Siegel's subjective complaints of pain.  *See Parisi*,

2007 WL 4554198 at *14 (finding no reason to give "any special weight" to the opinions of

claimant's treating physicians when their medical assessments "were based solely on [claimant's]

subjective complaints of pain").  Moreover, that Hartford (as well as Drs. Levy and Connolly)

made repeated attempts to discuss the medical record with Dr. Lattuga evidences that Hartford

_____

[6]      As set forth above, Dr. Levy's original report stated that Siegel "should not sit for periods greater than two hours in a seven hour period," but then opined that she "could continue to work at the sedentary level per DOT Guidelines."  (AR 275.)  Because these two statements appeared inherently contradictory, Hartford sent questions to Dr. Levy in an attempt to clarify his position.  Dr. Levy's amended report stated that Siegel "should be able to perform full-time seated duties (sedentary)."  (AR 267.)  Siegel takes issue with the format of the follow-up questions Hartford sent to Dr. Levy, and asserts that those questions "demonstrate[] that Hartford was more interested in obtaining an answer it could use to deny benefits than in clarifying the contradiction."  (Pl.'s Mem. at 12.)  The Court finds nothing objectionable with Hartford's decision to send directed (as opposed to open-ended) follow-up questions to Dr. Levy on this point.

did not "arbitrarily refuse[] to credit" Dr. Lattuga's opinion.  *See Hobson*, 574 F.3d at 90.

### C. Failure to Conduct an IME

Siegel asserts that although "the central issue in this claim" was Siegel's ability to sit, "Hartford never asked that she be examined or tested for her ability to sit."  (Pl.'s Mem. at 13.) Although the LTD Plan provides that Hartford had the right to require Siegel to submit to an IME, it certainly did not obligate Hartford to do so.  (*See* Solem Decl., Ex. A at 25.)  "If the language of a policy does not require an independent examination, it is not *per se* unreasonable to deny a plaintiff benefits without requesting an independent medical examination."  *Parisi*, 2007 WL 4554198 at *16 (internal alterations and quotation marks omitted).  Given Hartford's conclusion that Siegel had failed to proffer sufficient objective evidence in support of her subjective complaints of pain, and given that the evidence that was present in the record did not allow Siegel to establish that she was disabled within the meaning of the LTD Plan, the Court finds that Hartford's decision, in the exercise of its discretion, to deny Siegel's request for an IME was not arbitrary or capricious.  *See Hobson*, 574 F.3d at 91.

### IV. Conflict of Interest Analysis

Siegel argues that a "structural conflict of interest" existed because Hartford acted as both "claim administrator and insurer of the LTD Plan," and that Hartford was "significantly influenced" by that conflict of interest when it denied her claim for LTD benefits.  (Pl.'s Mem. at 5.)

This type of conflict of interest analysis "proceeds in two steps."  *Durakovic v. Building Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir. 2010).  "The initial inquiry is simple: whether the 'plan administrator both evaluates claims for benefits and pays benefits claims.'"  *Id.*

(quoting *Glenn*, 554 U.S. at 112, 114).  Here, the parties agree that Hartford both evaluates

claims for and pays LTD benefits and, thus, operated under a structural conflict of interest.  *See*

*Mugan v. Hartford Life Grp. Ins. Co.*, 765 F. Supp. 2d 359, 372 (S.D.N.Y. 2011) ("We agree

with Mugan that Hartford had a structural conflict of interest because Hartford both determined

the validity of an employee's claim under the Plan and was responsible for paying benefits to

claimants.").

    The Court, therefore, must proceed to the second step and "determine how heavily to

weight the conflict of interest thus identified." *Durakovic*, 609 F.3d at 138.  The Supreme Court

has explained:

> [W]hen judges review the lawfulness of benefit denials, they will
> often take account of several different considerations of which a
> conflict of interest is one . . . In such instances, any one factor will
> acts as a tiebreaker when the other factors are closely balanced, the
> degree of closeness necessary depending upon the tiebreaking factor's
> inherent or case-specific importance.  The conflict of interest . . .
> should prove more important (perhaps of great importance) where
> circumstances suggest a higher likelihood that it affected the benefits
> decision, including, but not limited to, cases where an insurance
> company administrator has a history of biased claims administration.
> It should prove less important (perhaps to the vanishing point) where
> the administrator has taken active steps to reduce potential bias and
> to promote accuracy, for example, by walling off claims
> administrators from those interested in firm finances, or by imposing
> management checks that penalize inaccurate decisionmaking
> irrespective of whom the inaccuracy benefits.

*Glenn*, 554 U.S. at 117 (internal citations omitted); *see also McCauley v. First Unum Life Ins.*

*Co.*, 551 F.3d 126, 132-33 (2d Cir. 2008) (abandoning prior Second Circuit standard to the extent

it was inconsistent with *Glenn*).

    Here, Hartford has presented evidence that it has "taken active steps to reduce potential

bias and to promote accuracy," as endorsed by the Supreme Court in *Glenn*.  Hartford has walled

off its claims administrators from its finance department, does not provide its claims or appeals

specialists with financial compensation that is tied to denial of benefits claims, and maintains

separate units for initial claim review and appeals.  (*See* Decl. of Bruce Luddy, dated May 31,

2011 ("Luddy Decl.") ¶¶ 2-5, 8, 9, 11, 12; Solem Decl. ¶¶ 7-9.)[7]  Moreover, Hartford assigned

multiple individuals to make and then review the initial decision to deny Siegel's claim, and

assigned separate individuals to process her appeal, all of which "promotes accuracy of the

administrator's review process."  *Bendik v. Hartford Life Ins. Co.*, 2010 WL 2730465, at *5

(S.D.N.Y. July 12, 2010).  Finally, the individuals and consultants who reviewed Siegel's claim

made numerous attempts to contact Siegel's treating physician and include his input in her file,

which "indicate[s] that Hartford made a concerted effort to promote the accuracy of the claims

process."  *Id.*  Accordingly, any asserted structural conflict of interest on Hartford's part "proves

less important (perhaps to the vanishing point)."  *Schnur v. CTC Commc'ns Corp.*, 2011 WL

855861, at *2 (2d Cir. Mar. 14, 2011) (unpublished) (internal quotation marks and alterations

omitted).

   Siegel argues that Hartford's "decision to pay STD benefits, but not LTD benefits, offers

a clear picture of Hartford's conflict of interest at work," and "clearly evidenc[es] that its

---

   [7]  Siegel argues that "[s]ince [the Solem and Luddy] Declarations are documents outside of the [administrative] record, and there has been no discovery regarding the truth of either Declaration, [she] cannot in good faith comment on their veracity."  (Pl.'s Mem. at 14.) The Second Circuit has "not limited a court's ability to [weigh the conflict of interest factor] to those instances in which the evidence bearing on the conflict of interest is confined to the administrative record."  *Fortune v. Grp. Long Term Disability Plan for Employees of Keyspan Corp.*, 2010 WL 3393758, at *3 (2d Cir. Aug. 30, 2010), *aff'g* 637 F. Supp. 2d 132 (E.D.N.Y. 2009).  Thus, the Court does not find it improper to consider the submitted declarations on this issue.

decisions were driven not by claim management considerations, but by concern for its own pocketbook." (Pl.'s Mem. at 9, 10.) The Court disagrees. At least one court within this Circuit has held that, if anything, an administrator's decision to initially award STD benefits evidences the *absence* of a conflict of interest because such a decision "was against its financial interest." *See Bendik*, 2010 WL 2730465 at *5. Moreover, Hartford's decision to award STD benefits does not legally preclude it from later denying a claim for LTD benefits, particularly where, as here, Hartford relied on a different (and less developed) record to make its STD benefit determination, and the STD benefits were awarded for a limited duration. *See Graham v. First Reliance Standard Life Ins. Co.*, 2007 WL 2192399, at *8 (S.D.N.Y. July 31, 2007).

### *CONCLUSION*

For the reasons set forth above and having carefully considered the administrative record and the parties' submissions, Hartford's motion for summary judgment is granted and Siegel's cross-motion is denied. Hartford's motion to strike is deemed moot. The Clerk of Court is directed to close this case.

**SO ORDERED.**

Dated: Central Islip, New York
June 25, 2012

_____/s/_____
Denis R. Hurley
Unites States District Judge